**Opinion issued May 18, 2023**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-22-00870-CV

———————————

## IN THE INTEREST OF D.J.G., A CHILD

———————————————————————

**On Appeal from the 315th District Court**
**Harris County, Texas**
**Trial Court Case No. 2021-01520J**

———————————————————————

## MEMORANDUM OPINION

In this accelerated appeal,[1] appellant, father, challenges the trial court's order,

entered after a bench trial, terminating his parental rights to his minor child, D.J.G.,[2]

---

[1]    *See* TEX. FAM. CODE ANN. § 263.405(a); TEX. R. APP. P. 28.4.

[2]    D.J.G. was one-year old when the trial court signed its order terminating father's
       parental rights. The trial court also terminated the parental rights of D.J.G.'s mother
       ("mother"), but she is not a party to this appeal.

and awarding the Department of Family and Protective Services ("DFPS") sole managing conservatorship of D.J.G. In five issues, father contends that the trial court erred in not appointing father as a possessory conservator of D.J.G., the evidence is legally and factually insufficient to support the trial court's findings that father knowingly placed, or knowingly allowed D.J.G. to remain, in conditions or surroundings which endangered his physical or emotional well-being,[3] engaged, or knowingly placed D.J.G. with persons who engaged, in conduct that endangered his physical and emotional well-being,[4] and failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return of D.J.G.,[5] and the evidence is factually insufficient to support the trial court's finding that termination of father's parental rights was in the best interest of D.J.G.[6]

We affirm.

## Background

On September 29, 2021, DFPS filed a petition seeking termination of father's parental rights to D.J.G. and managing conservatorship of D.J.G.

---

[3]     *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D).

[4]     *See id.* § 161.001(b)(1)(E).

[5]     *See id.* § 161.001(b)(1)(O).

[6]     *See id.* § 161.001(b)(2).

2

*Removal Affidavit*

At trial, the trial court admitted into evidence a copy of the affidavit of DFPS investigator Kimberly Turknett. Turknett testified that on July 16, 2021, DFPS received a referral alleging neglectful supervision of D.J.G., who was born on July 12, 2021. The referral alleged that mother had "a history of substance abuse[,] including heroin" use, and she had used narcotics while pregnant with D.J.G. D.J.G. was born prematurely at "[seven] months gestation" and was diagnosed with neonatal abstinence syndrome[7] because of mother's use of "an opioid dependence medication" during pregnancy. D.J.G., upon birth, "experience[d] withdrawal symptoms" and needed to be weaned off the opioid dependence medication, which "required morphine to manage his [withdrawal] symptoms and [for] comfort." The referral also alleged that mother had a history of "chronic homelessness" and not "living in a stable environment," and she had been "engaging in prostitution to make money." Mother had previously had her parental rights to four of her other children terminated.

Following the referral and as part of her investigation, Turknett spoke with a DFPS caseworker involved in the case related to the termination of mother's parental

---

[7]  *See In re M.T.*, No. 14-22-00198-CV, 2022 WL 3204819, at *7 (Tex. App.— Houston [14th Dist.] Aug. 9, 2022, no pet.) (mem. op.) (neonatal abstinence syndrome "refers to the collection of symptoms a child exhibits if the child was exposed to opiate drugs in utero").

3

rights to her other four children. That DFPS caseworker reported that father had called her to inform her that mother had given birth to D.J.G. and he believed that he was the father of D.J.G. Father stated that mother "[was] a prostitute in the area and [was] living in and out of hotels." According to father, mother "had a drug problem," and he was concerned that mother had been using narcotics while pregnant. Turknett was not able to speak to father during her investigation, and his location was unknown.

Ultimately, from her investigation, Turknett concluded that mother had displayed a history of failing to remain narcotics-free, a continuous pattern of narcotics-use, and chronic homelessness. Despite having knowledge of her pregnancy with D.J.G., mother continued using narcotics, which caused D.J.G. to be born prematurely, be diagnosed with neonatal abstinence syndrome, experience narcotics withdrawal symptoms, and require morphine to manage his symptoms and for comfort. Mother was "believed to be homeless and prostituting throughout the Houston area in order to make money." And she had been "observed to be extremely dirty, unkept and smelling strongly of odor and smoke." D.J.G. spent a couple months in the hospital following his birth.

### DFPS Caseworker Jones

DFPS caseworker Maci Jones testified that, at the time of trial, D.J.G. was about one-year old. D.J.G. entered DFPS's care after he was born prematurely, as a

4

result of mother's narcotics use while pregnant. At the time of D.J.G.'s birth, mother tested positive for an "opioid dependence medication." D.J.G. also tested positive for the opioid dependence medication and was diagnosed with neonatal abstinence syndrome. He experienced "opiate withdrawals." According to Jones, mother had a history of substance abuse and had previously had her parental rights to her four other children terminated.[8]

When someone from DFPS spoke to mother following D.J.G.'s birth, mother admitted to using methamphetamine and marijuana while she was pregnant with D.J.G. According to Jones, this was concerning because mother's narcotics use while pregnant could have caused "several health issues and harm" to D.J.G. Mother's narcotics use "directly place[d] [D.J.G.] in danger." According to Jones, mother had displayed a blatant disregard for D.J.G.'s health when she used narcotics while pregnant with him.

As to mother's narcotics use, Jones testified that mother had been using narcotics for multiple years, which was indicative of a pattern. Further, mother tested positive for "opiates and heroin" on August 12, 2021—about a month after D.J.G.'s birth. Mother had also "no-show[ed]" for other required narcotics-use

---

[8]     Jones stated that mother's parental rights to her other four children had been terminated partly due to her continuing narcotics use. DFPS received a referral related to mother's four other children in July 2019, and it received a referral related to D.J.G. in July 2021.

testing during the pendency of the case. Mother's visitation with D.J.G. was suspended in February 2022 because she had refused to participate in the required narcotics-use testing.

As to father, Jones stated that DFPS could not locate him following D.J.G.'s birth. Eventually, father contacted DFPS, and his paternity as to D.J.G. was established. According to Jones, mother and father had been in a dating relationship, at least since 2018, and because of that relationship, father was aware of mother's lifestyle—which included narcotics use and prostitution. Jones described father and mother's relationship as "extremely violent." When father found out that mother was pregnant with D.J.G., he assaulted her.

Jones further explained that father had previously been convicted of the offense of assault of a family member,[9] stemming from an incident between mother and father in 2018. And at the time of trial, he was charged with the offense of aggravated assault of a family member,[10] stemming from an incident between mother and father in 2021.

---

[9] *See* TEX. PENAL CODE ANN. § 22.01(a)(1); *see also id.* § 12.21 ("An individual adjudged guilty of a [c]lass A misdemeanor [offense] shall be punished by: (1) a fine not to exceed $4,000; (2) confinement in jail for a term not to exceed one year; or (3) both such fine and confinement.").

[10] *See id.* §§ 22.01(a)(2), 22.02(a)(2), (b)(1); *see also* TEX. FAM. CODE ANN. § 71.0021(b); TEX. PENAL CODE ANN. § 12.32 ("An individual adjudged guilty of a felony of the first degree shall be punished by imprisonment in the Texas Department of Criminal Justice for life or for any term of not more than 99 years or less than 5 years [and] . . . a fine not to exceed $10,000.").

As to father's commission of the 2018 assault-of-a-family-member offense, Jones testified that mother was the complainant, and father had "struck her with his hand." Father was found guilty of the offense of assault of a family member and sentenced to confinement for 300 days. As to the 2021 aggravated assault of a family member, with which father was charged, Jones stated that the offense occurred on April 3, 2021, and mother was the complainant. At the time, mother was five-months pregnant with D.J.G., which father knew. Related to that offense, father hit mother's car in "a head-on collision" with his car, and then pulled a man, who was in mother's car, out of her car and "assaulted him." Father hit mother's car "so hard" with his car "that there was actual front-end damage to both" cars. Jones noted that such behavior by father constituted "endangering conduct" because father "knew that [mother] was pregnant and he used a [car] as a weapon to harm not only her but also [D.J.G.,] his unborn child."

Jones stated that father's charge for the 2021 offense of aggravated assault of a family member was still pending at the time of trial, and related to that pending criminal charge, father was subject to certain "bond conditions." As part of his bond conditions, father was supposed to stay away from mother and was supposed to refrain from alcohol and narcotics use. Jones testified that father had violated those bond conditions during the pendency of this case. According to Jones, father's failure to comply with his bond conditions was concerning because if his "bond

7

[was] revoked," "he would go back to jail." Further, if father was convicted of the offense of aggravated assault of a family member, father would "face a significant [amount of] time in jail." And if father went to jail, "where [was D.J.G.] going to go?"

Jones also testified that father was given a Family Service Plan ("FSP") that he was ordered to complete. As part of his FSP, father was required to provide proof of stable housing and stable income, complete a psychosocial assessment, a domestic violence assessment, and a substance abuse assessment, and participate in narcotics-use testing. Prior to trial, father had not completed the requirements of his FSP, and according to Jones, father's failure to complete his FSP showed an inconsistency in his life and a lack of a desire to address why D.J.G. had entered DFPS's care.

Jones explained that father had not provided proof of stable housing, and father had only provided "sporadic pay stubs," which did not show a "stability of income." As to father's income, Jones noted that father had not provided any "paycheck stubs" related to the limousine company where he purportedly worked. And although father had told DFPS that he did "car repairs as kind of a side job," he had not provided any verifiable invoices or bank statements to "prove that income [was] consistently coming in." Another DFPS caseworker had previously explained

8

to father that she would not be able to verify his income based on the invoices that he had provided.

Jones further testified that father had completed his psychosocial assessment, and it recommended that father participate in a psychological evaluation, individual counseling, anger management classes, and a domestic violence treatment program. But father did not complete his psychological evaluation. Father did complete his substance abuse assessment, and he participated in individual counseling. And he completed his anger management classes. Father had completed six or seven individual "substance abuse therapy" classes from June 2022 to July 2022, but Jones stated that father needed more treatment because of his substantial history of narcotics use. Father also had not participated in "group therapy for substance abuse" which was required.[11] And he had not completed a domestic violence treatment program. It appeared to Jones that father was attempting to rush to complete the requirements of his FSP at the last minute before trial.

As to father's narcotics use, Jones testified that on October 14, 2021, father tested positive for benzodiazepines. In November 2021, father tested negative for narcotics use. But on December 20, 2021, father tested positive for oxymorphone

---

[11] Jones noted that father purportedly participated in an "inpatient [substance abuse] treatment program" in March 2022, but father had not "sign[ed] a release of information with" that program so that DFPS could "receive any notes or anything" from the program related to father.

and oxycodone. On February 28, 2022, father tested positive for cocaine, oxymorphone, and oxycodone. In May 2022, father tested positive for oxycodone. Father tested negative for narcotics use in July and August 2022. According to Jones, father's narcotics-use testing showed an increase in narcotics-use over time. And father's pattern of narcotics use during the pendency of this case constituted endangering conduct. Although father's most recent narcotics-use test was negative, that was not enough to show sobriety.

During her testimony, Jones expressed concerns about father's parental abilities. Jones noted that father and D.J.G. appeared bonded at visits, and father had brought food and clothes to a visit. But at some of his visits with D.J.G., father appeared intoxicated. He was slurring his words, stumbling, and could not keep his balance. These visits were terminated early because of father's behavior. Jones also explained that father had brought mother, who waited in the car, to one of his visits with D.J.G., even though mother's visits with D.J.G. had been suspended by the trial court and father, as part of his bond conditions related to his pending charge for the offense of aggravated assault of a family member, was not supposed to be near mother. Jones noted that mother's presence with father at the visit indicated the possibility of "a continued relationship" between mother and father and that mother may have access to D.J.G. if he was placed in father's care. It would be detrimental

for mother to have access to D.J.G. because of her significant history of narcotics use[12] and her complete failure to participate in the pending case.

As to D.J.G., Jones testified that D.J.G. had been in the same two-parent foster home since he had entered DFPS's care in 2021. D.J.G.'s foster parents wanted to adopt D.J.G. D.J.G.'s foster parents were aware that D.J.G. had biological siblings, and they were willing to ensure that he remained in contact with those siblings as much as possible.

Jones also testified that D.J.G. was thriving in his placement with his foster parents, and his foster parents were meeting his physical and emotional needs. While in his foster parents' care, D.J.G. had received a dental examination and his "one-year-old [medical] checkup." D.J.G. was "a little delayed" developmentally. He had only recently started crawling, despite already being one-year old. He received occupational therapy and physical therapy to help with his development. D.J.G. had been making progress developmentally through his therapies. And Jones noted that therapies, including speech therapy, occupational therapy, and physical therapy, were planned for D.J.G. in the future.

According to Jones, D.J.G. was a young, vulnerable, and fragile child, who needed a nurturing, protective, and safe environment in which to live. D.J.G.'s foster

---

[12]     Jones recalled that mother had admitted to using methamphetamine and marijuana while pregnant with D.J.G. And mother tested positive for heroin use after D.J.G.'s birth. Mother's narcotics use contributed to D.J.G.'s premature birth.

11

parents had been providing such an environment for him and would continue to do so. In Jones's opinion, D.J.G.'s foster parents were able to meet his needs now and in the future.

In contrast, for father to establish that he could provide a safe and stable environment for D.J.G., father would need to show that his home was a narcotics-free environment, he was remaining narcotics-free, he was not engaging in criminal activity, he was continuing to seek treatment for his narcotics use, and he had a consistent income. And at the time of trial, father had not been able to establish those things. As to father's housing, Jones testified that father had not provided an actual lease agreement for the place where he lived; there was no contact information for his landlord on the document father had given to DFPS.[13] The document that father had provided was not sufficient to establish stable housing. And Jones believed that when another DFPS caseworker had tried to visit father's home, father was unavailable.

### Child Advocates Representative Andrews

Child Advocates, Inc. ("Child Advocates") representative Sarah Andrews testified that D.J.G. was a happy child. His foster parents were highly supportive of

---

[13] Jones explained, as to the document that father had given to DFPS: "[I]t's not like your average lease where you either have a landlord or . . . you have an apartment complex and it's through management that has the address, the name, the length of stay, all the different addendums and whoever is renting it out to you, their contact information. . . . [T]hat's what it was lacking."

him and were facilitating his developmental needs through therapy. D.J.G.'s foster parents had a loving home and other young children in the home. They were meeting D.J.G.'s needs and would be able to meet his needs in the future.

As to mother, Andrews testified that she was unable to provide a safe and stable environment for D.J.G. Mother had wholly failed to respond to DFPS during the pendency of the case.

As to father, Andrews expressed concern about father's pending charge for the offense of aggravated assault of a family member because father's behavior related to that offense endangered both mother and D.J.G. Andrews also expressed concern about father's history of narcotics use and noted that Child Advocates wanted father to engage in an intensive sobriety program, such as a "relapse prevention program" that included "a sponsor." And she explained that a longer period of negative narcotics-use testing by father was necessary to show that father could provide a safe and stable environment for D.J.G. Neither father's criminal history nor his history of narcotics use showed that he was capable of providing a safe and stable environment for D.J.G. According to Andrews, father tested positive for narcotics use in May 2022—about four months before trial.

Andrews also testified that she had observed some of father's visits with D.J.G. and D.J.G. was comfortable with father at visits. Father interacted with D.J.G. at his visits with the child.

Andrews believed that father's parental rights to D.J.G. should be terminated because he had not had a long history of "clean drug tests and sobriety." Child Advocates was only given information about father's housing seven days before trial, which made it hard to visit his home. And there were concerns about father's potential ongoing relationship with mother, and mother's access to D.J.G. if he was placed in father's care. Although mother's visits with D.J.G. were suspended in the case, mother had accompanied father to one of father's visits with D.J.G., and she waited in the car for the visit to be completed.

### Foster Mother

D.J.G.'s foster mother testified that D.J.G. was placed in her home on October 4, 2021. D.J.G. had developmental delays and was behind "on typical milestones." He was not rolling over or crawling at one-year old, and he was "apprehensive to eating." D.J.G. was mostly formula fed. With occupational therapy and physical therapy, D.J.G. had made significant improvements. Within the last four to six weeks before trial, D.J.G.'s foster mother had seen progression with D.J.G.'s crawling and standing up around furniture. D.J.G. attended occupational therapy and physical therapy on a weekly basis. D.J.G. was also seeing an eating specialist to aid him with his food progression, and he was going to start speech therapy soon. The speech therapy was for "early intervention" and was also going to work with him on eating.

D.J.G.'s foster mother noted that after D.J.G. came to live with her family, she and her husband also sought to have one of mother's older children—D.J.G.'s older brother—come live with them to try to "keep a bio sibling group together." At first, the older brother got along well with D.J.G., but this was before the foster parents were given clearance to tell the older brother that D.J.G. was his biological sibling. After receiving clearance and telling the older brother that D.J.G. was his biological sibling and "who [D.J.G.'s] father was," the older brother would not go near D.J.G. The older brother, although he tried, was unable to interact with D.J.G. "in a healthy way."

D.J.G.'s foster mother noted that when the older brother found out that father was D.J.G.'s father, he became physically upset. The older brother told the foster mother that D.J.G. "was just a constant reminder of . . . mother and of [father] and it brought back a lot of bad memories for him and he just couldn't disconnect and accept [D.J.G.] as his biological sibling." While previously living with mother, the older brother had witnessed domestic violence between mother and father. He told D.J.G.'s foster mother that mother and father's relationship had been "very physical" and it contained "a lot of violence," "a lot of drug use," and "a lot of sexual activity in front of" the older brother and his siblings. The older brother often saw mother "pretty much comatose[] on opioids." And he stated that he saw mother "get beat down and busted up" by father; "it was just almost nonstop." Mother and father's

relationship had traumatized the older brother, and the older brother displayed similar violent behaviors while in D.J.G.'s foster mother's home, which the foster mother believed had been learned while in the care of mother. Eventually, the older brother was placed in another foster home and D.J.G. remained with his foster parents. Given what she had learned from D.J.G.'s older brother and the behaviors he displayed, D.J.G.'s foster mother stated that she believed it would be detrimental for D.J.G. to be placed in father's care.

D.J.G.'s foster mother further testified that she and her husband wanted to adopt D.J.G. D.J.G.'s foster parents had also adopted twins, so D.J.G. had siblings in the home. D.J.G.'s foster mother noted that she had facilitated "FaceTime visits"[14] with one of D.J.G.'s biological sisters, and D.J.G. had "in-person visits with all of [his biological] siblings." D.J.G.'s foster parents were open and supportive of D.J.G. having contact with his biological siblings.

According to D.J.G.'s foster mother, D.J.G. was going to need "therapeutic services for several years to kind of catch up" developmentally and she and her husband were willing to provide that for him as long as he needed it.

---

[14]  "Facetime is a[] [cellular telephone] application that allows individuals to make video calls from telephones. FaceTime also may run from other electronic devices." *Oballe v. State*, No. 01-20-00075-CR, 2020 WL 6494191, at *3 n.4 (Tex. App.— Houston [1st Dist.] Nov. 5, 2020, no pet.) (mem. op., not designated for publication) (alterations in original) (internal quotations omitted).

*Father*

Father testified that he was D.J.G.'s father. Father stated that he lived in a "unit" that he was leasing from an individual person. He provided the DFPS caseworker with "a lease." Father worked for a limousine company, and the last time he had given the DFPS caseworker a paycheck stub was in July 2022. According to father, his work with the limousine company was slow, so he had a side business "picking up customers and customers calling [him] to do work on their vehicles." He had provided the DFPS caseworker with "invoices" related to his side business. He did not have a bank account so he could not provide bank statements to show his income.

Father testified that his income was about $3,500 or $4,000 a month. He paid $800 a month for rent. In total, the amount of his bills each month was less than $2,000.

As to his narcotics use, father stated that he began using opiates in 2020 and he previously used oxycodone. He "went into rehab" in the spring of 2022 "to get help to get [himself] away from painkillers." According to father, he was at a detox center for thirty days. While there, father attended counseling three times a week. He was discharged from the detox center on April 2, 2022. Father stated that he sent a DFPS caseworker "a text [message] with images that [he] was discharged" and he signed "a release for her to get all . . . [the] information she needed" from the detox

17

center. Father did not have a sponsor, but he was participating in a "higher power program."

As to his FSP, father testified that he received his FSP in November 2021. But, he did not start working on the requirements of his FSP until thirty days after he left the detox center. Father noted that before entering the detox center, he did not complete any of the requirements of his FSP because his father "caught COVID-19"[15] in January 2022 and died in February 2022. And during the thirty days after leaving the detox center, father "took . . . [thirty] days not to do anything" before "start[ing] [the] things [he] needed to do."

As to completing the requirements of his FSP, father stated that he had participated in individual counseling and was successfully discharged. Although he had been required to participate in a domestic violence treatment program, he had not completed that requirement yet because he had "login problems." Father also had not completed his psychological evaluation. Father admitted that he had not completed all of the requirements of his FSP.

As to mother, father stated that he did not have contact with her. But the last time that he saw her, mother gave him a ride to his visit with D.J.G. during the pendency of the case. Father admitted that having contact with mother at that time

---

[15]  *See generally Kim v. Ramos*, 632 S.W.3d 258, 261 n.5, 266 n.13 (Tex. App.—Houston [1st Dist.] 2021, no pet.) (discussing COVID-19 pandemic).

18

violated his "bond condition[s]." But his car was not working, and mother "was there," so he asked her for a ride.

If D.J.G. was placed in his care, father planned to "show him life that [he] showed for [his] other children." They would have "time to bond," and father would "take him on trips," "watch him grow," love him, and care for him. Father had three other children who were adults. Father's adult children would be his support system as well as his mother and his two sisters.

### Father's FSP

The trial court admitted into evidence a copy of father's FSP. The FSP states that DFPS wanted D.J.G. to have a safe, healthy, and permanent home that was free from narcotics and violence.

As to D.J.G., the FSP states that he was born prematurely at "[seven] months gestation." He was diagnosed with neonatal abstinence syndrome because of mother's use of "an opioid dependence medication," which caused D.J.G. "to experience withdrawal symptoms" following his birth. D.J.G. needed morphine to manage his symptoms. D.J.G. experienced difficulty with feeding, which was common for babies who had been exposed to narcotics during pregnancy.

As to father, the FSP states that father reported that he lived in an apartment and he worked two jobs. Father reported that he had previously raised children and his support system consisted of his adult children and his parents. Father reported

19

that he had not completed high school and did not want "any educational assistance at this point in his life." Father stated that he did not have "substance abuse issues" and he did not engage in domestic violence in his previous relationship. But the report notes that father tested positive for marijuana use, and mother had reported that father had "beat her up."

Under his FSP, father was required to, among other things: (1) maintain stable housing for more than six months and provide a lease agreement to DFPS; (2) maintain employment for six months and provide paycheck stubs to DFPS; (3) complete a substance abuse assessment and follow its recommendations; (4) participate in random narcotics-use testing and test negative at all times; and (5) complete a psychosocial assessment and follow its recommendations.

### *Narcotics-Use Testing Records*

The trial court admitted into evidence copies of father's narcotics-use testing results.[16] The testing results show that on October 14, 2021, father tested positive for benzodiazepines by urinalysis. On November 30, 2021, father tested negative for narcotics use. On December 20, 2021, father tested positive for oxycodone and oxymorphone by urinalysis and positive for oxycodone by hair-follicle testing. On

---

[16] The trial court also admitted into evidence copies of mother's narcotics-use testing results from 2019, 2020, and 2021. Mother tested positive for narcotics-use while pregnant with D.J.G. After D.J.G.'s birth, mother tested positive for heroin by hair-follicle testing. Mother stopped participating in narcotics-use testing in August 2021.

February 17, 2022, father failed to appear for narcotics-use testing as ordered by the trial court.[17]  On February 28, 2022, father tested positive for benzodiazepines, oxycodone, and oxymorphone by urinalysis and cocaine, oxycodone, and oxymorphone by hair-follicle testing.  On May 11, 2022, father tested negative for narcotics use by urinalysis, but positive for oxycodone by hair-follicle testing.  On May 31, 2022, father tested negative for narcotics use by urinalysis, but positive for oxycodone by hair-follicle testing.

*Criminal History*

The trial court admitted into evidence a copy of the indictment related to appellant's commission of the 2018 misdemeanor offense of assault of a family member.  The indictment alleged that, on or about April 11, 2018, father "intentionally and knowingly cause[d] bodily injury to [mother], a person with whom [father] had a dating relationship, . . . by striking [mother] with his hand."[18] The trial court also admitted into evidence a copy of the judgment of conviction showing that on May 2, 2019, father was convicted of the misdemeanor offense of assault of a family member and was sentenced to confinement for 300 days.  The

---

[17]  A copy of the trial court's February 17, 2022 order requiring father to immediately report to the National Screening Center to submit to narcotics-use testing was admitted into evidence at trial.

[18]  *See* TEX. PENAL CODE ANN. § 22.01(a)(1); *see also id.* § 12.21 ("An individual adjudged guilty of a [c]lass A misdemeanor [offense] shall be punished by: (1) a fine not to exceed $4,000; (2) confinement in jail for a term not to exceed one year; or (3) both such fine and confinement.").

trial court then suspended father's sentence, placed father on community supervision for fifteen months, and assessed a fine of $100.

The trial court further admitted into evidence a copy of the indictment related to the 2021 felony offense of aggravated assault of a family member with which appellant was charged at the time of trial. The indictment alleged that, on or about April 3, 2021, father "unlawfully, intentionally[,] and knowingly threaten[ed] [mother], . . . a person with whom [father] had a dating relationship, with imminent bodily injury by using and exhibiting a deadly weapon, namely a motor vehicle."[19]

Related to the charged felony offense of aggravated assault of a family member, the trial court admitted into evidence a copy of father's bond conditions, which required father, among other things, to have no contact with mother and to refrain from using, possessing, or consuming alcohol, controlled substances, "dangerous drug[s]," or marijuana unless prescribed by a medical doctor.

### September 2022 Permanency Report

The trial court admitted into evidence a copy of a September 2022 permanency report filed by DFPS. As to D.J.G., the permanency report states that he had been in his placement with his foster parents since September 30, 2021.

---

[19] *See* TEX. PENAL CODE ANN. §§ 22.01(a)(2), 22.02(a)(2), (b)(1); *see also* TEX. FAM. CODE ANN. § 71.0021(b); TEX. PENAL CODE ANN. § 12.32 ("An individual adjudged guilty of a felony of the first degree shall be punished by imprisonment in the Texas Department of Criminal Justice for life or for any term of not more than 99 years or less than 5 years [and] . . . a fine not to exceed $10,000.").

D.J.G. was one year old, "nonverbal," and could not walk or crawl. He had feeding difficulties. D.J.G. was developmentally delayed, and he received occupational, physical, and speech therapy. D.J.G.'s mental, social, physical, and medical needs were being met in his foster home. D.J.G. loved his foster family, and he participated in age-appropriate activities with his foster family. He was interested in playing with toys and his foster siblings. D.J.G.'s foster parents "ensured that he [was] able to live a normal life."

While in his foster parents' care, D.J.G. had received medical and dental checkups. It was recommended that D.J.G. continue with physical and occupational therapy to address his developmental delays.

As to father, the permanency report states that he had consistently visited D.J.G. during the pendency of the case. And father had contact with mother. Father tested positive for marijuana by hair-follicle testing on September 28, 2021, positive for oxycodone by urinalysis and hair-follicle testing on December 20, 2021, positive for cocaine, oxycodone, and oxymorphone by hair-follicle testing on February 28, 2022, and positive for oxycodone by hair-follicle testing on May 31, 2022. Father tested negative for narcotics use by urinalysis on May 11, 2022, June 15, 2022, July 14, 2022, July 28, 2022, August 9, 2022, and August 25, 2022.

As to father's FSP, the permanency report states that father completed his psychosocial evaluation on April 1, 2022, which recommended that father complete

23

a psychological evaluation and participate in individual counseling, anger management classes, domestic violence education, and substance abuse individual and group therapy. The permanency report also states that father completed his domestic violence assessment on April 1, 2022, which recommended that father participate in individual counseling, complete a substance abuse assessment and substance abuse treatment, and a psychological evaluation. Further, on April 1, 2022, father completed a substance abuse assessment, which recommended that father participate in individual and group substance abuse counseling, complete a psychological evaluation, participate in a domestic violence treatment program, and participate in domestic violence education.

Additionally, as to father's FSP, the permanency report states that although father had reported to DFPS that he had housing, he gave DFPS a new address on September 5, 2022 and he had not provided a lease agreement related to this new address. Father also told DFPS that he was employed, but he had not provided proof of employment to the DFPS caseworker. Father had signed the required release of information form for DFPS.

The permanency report states that DFPS was recommending that father's parental rights be terminated and that D.J.G. remain in his placement with his foster parents.

## Sufficiency of Evidence

In his first, second and third issues, father argues that the trial court erred in terminating his parental rights to D.J.G. because the evidence is legally and factually insufficient to support the trial court's findings that father knowingly placed, or knowingly allowed D.J.G. to remain, in conditions or surroundings which endangered his physical or emotional well-being, engaged, or knowingly placed D.J.G. with persons who engaged, in conduct that endangered his physical and emotional well-being, and failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return of D.J.G.[20] *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O). In his fourth issue, father argues that the trial court erred in terminating his parental rights to D.J.G. because

---

[20] In its appellee's brief, DFPS concedes that the evidence is legally insufficient to support the trial court's finding that father knowingly placed, or knowingly allowed D.J.G. to remain, in conditions or surroundings which endangered his physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D). Thus, we sustain the portion of father's first issue in which he asserts that the that the evidence is legally insufficient to support the trial court's finding that father knowingly placed, or knowingly allowed D.J.G. to remain, in conditions or surroundings which endangered his physical or emotional well-being. *See In re S.A.Y.W.*, No. 14-16-00280-CV, 2016 WL 4705767, at *3, *5 n.6 (Tex. App.—Houston [14th Dist.] Sept. 8, 2016, pet. denied) (mem. op.) (sustaining parent's challenge to sufficiency of evidence supporting trial court's finding under Texas Family Code section 161.001(b)(1)(K) and (N) because DFPS conceded evidence insufficient). But the sustaining of a portion of father's first issue does not affect the ultimate disposition of the appeal as discussed below. *See infra*. We also need not address the remaining portion of father's first issue in which he asserts that the evidence is factually insufficient to support trial court's finding that father knowingly placed, or knowingly allowed D.J.G. to remain, in conditions or surroundings which endangered his physical or emotional well-being.

the evidence is factually insufficient to support the trial court's finding that termination of his parental rights was in the best interest of D.J.G. *See id.* § 161.001(b)(2).

A parent's right to "the companionship, care, custody, and management" of his child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (internal quotations omitted). The United States Supreme Court has emphasized that "the interest of [a] parent[] in the care, custody, and control of [his] child[] . . . is perhaps the oldest of the fundamental liberty interests recognized by th[e] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Likewise, the Texas Supreme Court has concluded that "[t]his natural parental right" is "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (internal quotations omitted). Consequently, "[w]e strictly construe involuntary termination statutes in favor of the parent." *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012).

Because termination of parental rights is "complete, final, irrevocable and divests for all time that natural right . . . , the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights." *Holick*, 685 S.W.2d at 20. Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN.

26

§ 101.007; *see also In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Because the standard of proof is "clear and convincing evidence," the Texas Supreme Court has held that the traditional legal and factual standards of review are inadequate. *In re J.F.C.*, 96 S.W.3d at 264–68.

In conducting a legal-sufficiency review in a termination-of-parental-rights case, we must determine whether the evidence, viewed in the light most favorable to the finding, is such that the fact finder could reasonably have formed a firm belief or conviction about the truth of the matter on which DFPS bore the burden of proof. *Id.* at 266. In viewing the evidence in the light most favorable to the finding, we "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (internal quotations omitted). However, this does not mean that we must disregard all evidence that does not support the finding. *In re J.F.C.*, 96 S.W.3d at 266. Because of the heightened standard, we must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.* If we determine that no reasonable trier of fact could form a firm belief or conviction that the matter that must be proven is true, we must hold the evidence to be legally insufficient and render judgment in favor of the parent. *Id.*

In conducting a factual-sufficiency review in a termination-of-parental-rights case, we must determine whether, considering the entire record, including evidence both supporting and contradicting the finding, a fact finder reasonably could have formed a firm conviction or belief about the truth of the matter on which DFPS bore the burden of proof. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). We should consider whether the disputed evidence is such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (internal quotations omitted).

In order to terminate the parent-child relationship, DFPS must establish, by clear and convincing evidence, one or more of the acts or omissions enumerated in Texas Family Code section 161.001(b)(1) and that termination of parental rights is in the best interest of the child. *See* TEX. FAM. CODE ANN. § 161.001(b). Both elements must be established, and termination may not be based solely on the best interest of the child as determined by the trier of fact. *See id.*; *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Notably though, "[o]nly one predicate finding under section 161.001[(b)](1) is necessary to support a judgment

28

of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

## A. Endangerment

In his second issue, father argues that the evidence is legally and factually insufficient to support the trial court's termination of his parental rights to D.J.G. under Texas Family Code section 161.001(b)(1)(E) because although evidence was presented at trial about father's narcotics use, domestic violence between mother and father, father's knowledge of mother's narcotics use and criminal activity, and father's criminal history, the evidence did not constitute "clear and convincing" evidence which was "required to terminate [father's] parental rights." *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E).

A trial court may terminate the parent-child relationship if it finds by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endanger[ed] the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E). Within this context, endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Boyd*, 727 S.W.2d at 533. Instead, "endanger" means to expose the child to loss or injury or to jeopardize their emotional or physical health. *Id.* (internal quotations omitted); *see*

29

*also Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 616 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

We must look at a parent's conduct standing alone, including his actions and omissions. *In re J.W.*, 152 S.W.3d 200, 205 (Tex. App.—Dallas 2004, pet. denied). It is not necessary to establish that a parent intended to endanger the child. *See In re M.C.*, 917 S.W.2d 268, 270 (Tex. 1996); *In re L.M.N.*, No. 01-18-00413-CV, 2018 WL 5831672, at *14 (Tex. App.—Houston [1st Dist.] Nov. 8, 2018, pet. denied) (mem. op.). But termination of parental rights requires "more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required." *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *see also In re L.M.N.*, 2018 WL 5831672, at *14; *In re J.W.*, 152 S.W.3d at 205. The specific danger to the child's well-being may be inferred from parental misconduct, even if the conduct is not directed at the child and the child suffers no actual injury. *See Boyd*, 727 S.W.2d at 533; *In re L.M.N.*, 2018 WL 5831672, at *14; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). Courts may consider parental conduct that did not occur in the child's presence, including conduct that occurred after the child was removed by DFPS. *In re L.M.N.*, 2018 WL 5831672, at *14; *In re A.A.M.*, 464 S.W.3d 421, 426 (Tex. App.—Houston [1st Dist.] 2015, no pet.).

A parent's narcotics use can qualify as a voluntary, deliberate, and conscious course of conduct that endangers the child's well-being. *In re T.S.*, No. 01-22-00054-CV, 2022 WL 4474277, at *30 (Tex. App.—Houston [1st Dist.] Sept. 27, 2022, no pet.) (mem. op.); *In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied); *In re S.R.*, 452 S.W.3d 351, 361–62 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). And continued narcotics use after a child's removal is conduct that jeopardizes a parent's parental rights and may be considered as establishing an endangering course of conduct. *In re T.S.*, 2022 WL 4474277, at *30; *In re C.V.L.*, 591 S.W.3d at 751; *In re S.R.*, 452 S.W.3d at 361–62; *see also Cervantes-Peterson v. Tex. Dep't of Fam. & Protective Servs.*, 221 S.W.3d 244, 253 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (considering conduct jeopardizing parental rights as part of course of conduct endangering well-being of child). When "a parent engages in [narcotics] use during the pendency of a [termination-of-parental-rights case], when he knows he is at risk of losing his child[], the evidence is legally sufficient to support a [trial court's] finding of endangerment." *In re D.D.M.*, No. 01-18-01033-CV, 2019 WL 2939259, at *4 (Tex. App.—Houston [1st Dist.] July 9, 2019, no pet.) (mem. op.); *see also In re T.S.*, 2022 WL 4474277, at *30; *In re R.S.*, No. 01-20-00126-CV, 2020 WL 4289978, at *7 (Tex. App.—Houston [1st Dist.] July 28, 2020, no pet.) (mem. op.) ("Parental [narcotics] use remains endangering conduct even if the child was not in the parent's

31

custody when the [narcotics] use occurred."); *In re A.M.*, 495 S.W.3d 573, 580 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) ("Because the evidence showed that the [parent] engaged in illegal [narcotics] use during the pendency of the termination suit, when he knew he was at risk of losing his children, we hold that the evidence is legally sufficient to support a finding of endangerment."). Further, when the evidence shows that the parent engaged in narcotics use during the pendency of the termination suit, and no evidence directly contradicts that, the evidence is factually sufficient to support the trial court's endangerment finding. *See In re A.M.*, 495 S.W.3d at 580; *see also In re D.D.M.*, 2019 WL 2939259, at *5.

Father testified that he began using opiates in 2020 and he had previously used oxycodone. The narcotics-use testing results admitted into evidence show that, during the pendency of this case, father tested positive on October 14, 2021 for benzodiazepines by urinalysis; positive on December 20, 2021 for oxycodone and oxymorphone by urinalysis and positive for oxycodone by hair-follicle testing; positive on February 28, 2022 for benzodiazepines, oxycodone, and oxymorphone by urinalysis and positive for cocaine, oxycodone, and oxymorphone by hair-follicle testing; positive on May 11, 2022 for oxycodone by hair-follicle testing; and positive on May 31, 2022 for oxycodone by hair-follicle testing.[21] Further, on February 17,

---

[21] Appellant, in his briefing, complains that no expert testified as "to provide any interpretation" of the narcotics-use testing results. However, appellant provides no authority to support his assertion that expert testimony was needed or required. *See*

2022, father failed to appear for narcotics-use testing as ordered by the trial court. *See In re I.W.*, No. 14-15-00910-CV, 2016 WL 1533972, at *6 (Tex. App.—Houston [14th Dist.] Apr. 14, 2016, no pet.) (mem. op.) (parent's "refusal to submit to the drug test may be treated by the [fact finder] as if he had tested positive for drugs"); *see also In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (fact finder could infer parent's failure to submit to court-ordered narcotics-use testing indicated she was avoiding testing because she was using narcotics).

Additionally, the permanency report states that father tested positive for marijuana by urinalysis on September 28, 2021.[22]   And DFPS caseworker Jones testified that father, during the pendency of this case, tested positive for narcotics use on October 14, 2021, December 20, 2021, February 28, 2022, and May 2022. From the evidence admitted at trial, the trial court could have reasonably inferred that father engaged in narcotics use during the pendency of the termination-of-parental-rights case. *See In re D.D.M.*, 2019 WL 2939259, at *4–5;

---

TEX. R. APP. P. 38.1(i) ("[Appellant's] brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."). The failure to provide substantive analysis of an issue or cite appropriate authority waives a complaint on appeal. *Marin Real Estate Partners, L.P. v. Vogt*, 373 S.W.3d 57, 75 (Tex. App.—San Antonio 2011, no pet.); *Huey v. Huey*, 200 S.W.3d 851, 854 (Tex. App.—Dallas 2006, no pet.).

[22]   The permanency report also lists the other dates, identified by the narcotics-use testing results, when father tested positive for narcotics use.

33

*In re A.M.*, 495 S.W.3d at 580; *see also In re D.L.W.W.*, 617 S.W.3d 64, 78–79 (Tex. App.—Houston [1st Dist.] 2020, no pet.) ("[W]e have [previously] concluded that illegal narcotics use may support termination under Texas Family Code section 161.001(b)(1)(E)."); *In re N.J.H.*, 575 S.W.3d 822, 831–32 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) ("[A] parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being." (alteration in original) (internal quotations omitted)).

We further note that "[a]s a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of [the] child." *In re R.W.*, 129 S.W.3d at 739. And a parent's abusive or violent conduct can produce an environment that endangers the child's well-being. *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.); *see also D.N. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-15-00658-CV, 2016 WL 1407808, at *2 (Tex. App.—Austin Apr. 8, 2016, no pet.) (mem. op.) ("[D]omestic violence may constitute endangerment, even if the violence is not directed at the child."). While direct physical abuse clearly endangers a child, domestic violence, want of self-control, and a propensity for violence may also be considered as evidence of endangerment. *See In re J.S.B.*, Nos. 01-17-00480-CV,

34

01-17-00481-CV, 01-17-00484-CV, 2017 WL 6520437, at *16 (Tex. App.—Houston [1st Dist.] Dec. 21, 2017, pet. denied) (mem. op.); *In re J.I.T.P.*, 99 S.W.3d at 845; *see also In re B. J. B.*, 546 S.W.2d 674, 677 (Tex. App.—Texarkana 1977, writ ref'd n.r.e.) (considering parent's lack of self-control and propensity for violence and aggression).

Moreover, courts have routinely considered evidence of parent-on-parent physical abuse in termination cases without requiring evidence that the conduct resulted in a criminal conviction. *See In re A.K.T.*, No. 01-18-00647-CV, 2018 WL 6423381, at *12 (Tex. App.—Houston [1st Dist.] Dec. 6, 2018, pet. denied) (mem. op.); *In re W.S.M.*, 107 S.W.3d 772, 772 (Tex. App.—Texarkana 2003, no pet.) (parent physically abused child's other parent); *Spangler v. Tex. Dep't of Protective & Regulatory Servs.*, 962 S.W.2d 253, 260 (Tex. App.—Waco 1998, no pet.); *see also In re DC*, No. 01-11-00387-CV, 2012 WL 682289, at *9–10 (Tex. App.—Houston [1st Dist.] Mar. 1, 2012, pet. denied) (mem. op.) (parent's testimony other parent physically and mentally abused her supported termination of other parent's parental rights under Texas Family Code section 161.001(b)(1)(E)); *Jordan v. Dossey*, 325 S.W.3d 700, 724 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (evidence of how parent treated another parent relevant). And evidence that a parent has engaged in abusive or violent conduct in the past permits an inference that he will continue his violent behavior in the future. *Jordan*, 325 S.W.3d at 724.

Here, the evidence shows that father was previously convicted of assaulting mother. The indictment related to father's commission of the 2018 offense of assault of a family member alleged that, on or about April 11, 2018, father "intentionally and knowingly cause[d] bodily injury to [mother], a person with whom [father] had a dating relationship, . . . by striking [mother] with his hand." *See* TEX. PENAL CODE ANN. § 22.01(a)(1); *see also In re J.B.M.*, No. 04-18-00717-CV, 2019 WL 1139858, at *2 (Tex. App.—San Antonio Mar. 13, 2019, pet. denied) (mem. op.) ("Domestic violence and a propensity for violence may be considered evidence of endangerment, even if the endangering acts did not occur in the children's presence, were not directed at the children, or did not cause actual injury to the children."). On May 2, 2019, appellant was convicted of the misdemeanor offense of assault of a family member and was sentenced to confinement for 300 days. *See* TEX. PENAL CODE ANN. § 12.21 ("An individual adjudged guilty of a [c]lass A misdemeanor [offense] shall be punished by: (1) a fine not to exceed $4,000; (2) confinement in jail for a term not to exceed one year; or (3) both such fine and confinement."). The trial court then suspended father's sentence, placed father on community supervision for fifteen months, and assessed a fine of $100. Related to father's commission of the 2018 offense of assault of a family member, Jones testified that father struck mother with his hand and he had been found guilty of the offense. *See In re S.R.*, 452 S.W.3d at 360–61 ("[E]vidence of criminal conduct, convictions, or imprisonment is relevant

to a review of whether a parent engaged in a course of conduct that endangered the well-being of [a] child."); *see also In re T.M.*, No. 14-14-00948-CV, 2015 WL 1778949, at *4 (Tex. App.—Houston [14th Dist.] Apr. 16, 2015, no pet.) (mem. op.) (although incarceration alone will not support termination of parental rights, evidence of criminal conduct, convictions, and imprisonment may support finding of endangerment); *In re A.A.M.*, 464 S.W.3d at 426–27 (criminal offenses "significantly harm the parenting relationship" and "can constitute endangerment even if the criminal conduct transpires outside the child's presence").

Jones also testified that father had more recently been charged with the offense of aggravated assault of a family member, stemming from an incident in 2021 between mother and father. As to that offense, Jones stated that the offense occurred on April 3, 2021, when mother was five-months pregnant with D.J.G. Father hit mother's car in "a head-on collision" with his car, and he then pulled a man, who was in mother's car, out of her car and "assaulted him." Father hit mother's car "so hard" with his car "that there was actual front-end damage to both" cars. Father knew mother was pregnant at the time of the commission of the 2021 aggravated-assault-of-a-family-member offense. And Jones stated that such behavior by father constituted "endangering conduct" because father "knew that [mother] was pregnant and he used a [car] as a weapon to harm not only her but also his unborn child." *See In re J.B.M.*, 2019 WL 1139858, at *2 ("Domestic violence

37

and a propensity for violence may be considered evidence of endangerment, even if the endangering acts did not occur in the children's presence, were not directed at the children, or did not cause actual injury to the children."). At the time of trial in the instant case, father's charge for the 2021 aggravated-assault-of-a-family-member offense was still pending, but if father is convicted of that offense, Jones stated that he would "face a significant [amount of] time in jail." *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied) ("An environment which routinely subjects a child to the probability that she will be left alone because her parent[] [is] once again jailed . . . endangers both the physical and emotional well-being of [the] child."); *see also In re A.A.M.*, 464 S.W.3d at 426–27 (criminal offenses "significantly harm the parenting relationship" and "can constitute endangerment even if the criminal conduct transpires outside the child's presence").

The trial court admitted into evidence a copy of the indictment related to the 2021 felony offense of aggravated assault of a family member with which appellant was charged.[23] The indictment alleged that, on or about April 3, 2021, father

---

[23] Father, in his briefing, in discussing the 2021 felony offense of aggravated assault of a family member, states that the trial court erroneously admitted "the [c]omplaint filed by the Harris County District Attorney," which "contained a statement by a Houston Police Department officer regarding the alleged events giving rise to the charge." Appellant did not raise as an issue on appeal whether the trial court erred in admitting Exhibit 33—the complaint related to father's pending charge for the 2021 offense of aggravated assault of a family member. *See* TEX. R. APP. P. 38.1(f) (requiring appellant's brief to concisely state all issues presented for review); *Jacobs v. Satterwhite*, 65 S.W.3d 653, 655–56 (Tex. 2001) (failure to raise issue on appeal waives error). Nevertheless, we have not, and need not, consider Exhibit 33 in

"unlawfully, intentionally[,] and knowingly threaten[ed] [mother], . . . a person with whom [father] had a dating relationship, with imminent bodily injury by using and exhibiting a deadly weapon, namely a motor vehicle." *See* TEX. PENAL CODE ANN. §§ 22.01(a)(2), 22.02(a)(2), (b)(1); *see also* TEX. FAM. CODE ANN. § 71.0021(b); TEX. PENAL CODE ANN. § 12.32 ("An individual adjudged guilty of a felony of the first degree shall be punished by imprisonment in the Texas Department of Criminal Justice for life or for any term of not more than 99 years or less than 5 years [and] . . . a fine not to exceed $10,000."); *see also In re J.B.M.*, 2019 WL 1139858, at *2 ("Domestic violence and a propensity for violence may be considered evidence of endangerment, even if the endangering acts did not occur in the children's presence, were not directed at the children, or did not cause actual injury to the children."). Notably, charged offenses themselves are relevant to the endangerment analysis, even where no criminal conviction has yet resulted. *See In re J.B.*, No. 02-22-00384-CV, 2023 WL 1859766, at *9 (Tex. App.—Fort Worth Feb. 9, 2023, pet. denied) (mem. op.); *see also In re S.A.*, No. 12-22-00111-CV, --- S.W.3d ---, 2022 WL 16558456, at *5 (Tex. App.—Tyler Oct. 31, 2022, pet. denied) ("Criminal

---

addressing appellant's complaint that the evidence is legally and factually insufficient to support the trial court's finding that father engaged, or knowingly placed D.J.G. with persons who engaged, in conduct that endangered his physical and emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E).

acts that also constitute domestic violence need not lead to indictment or conviction in order to be considered under the family code.")

Finally, in general, as to mother and father's relationship, Jones testified that the relationship was "extremely violent," and she stated that when father found out that mother was pregnant with D.J.G., he assaulted her. D.J.G.'s foster mother also testified that D.J.G.'s older brother, who lived with mother while she was in a relationship with father, reported that he had witnessed domestic violence between mother and father.[24] He told D.J.G.'s foster mother that mother and father's relationship had been "very physical" and it contained "a lot of violence," "a lot of drug use," and "a lot of sexual activity in front of" the older brother and his siblings. The older brother often saw mother "pretty much comatose[] on opioids." And he stated that he saw mother "get beat down and busted up" by father; "it was just almost nonstop." Mother and father's relationship traumatized the older brother who could not be around D.J.G. because D.J.G. "was just a constant reminder of . . . mother and of [father] and it brought back a lot of bad memories for him and he just couldn't disconnect and accept [D.J.G.] as his biological sibling." *See In re J.S.B.*, 2017 WL 6520437, at *16 (domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment); *D.N.*,

---

[24] Father acknowledged in his briefing that the foster mother's testimony about what D.J.G.'s older brother told her was "unobjected-to." *See* TEX. R. APP. P. 33.1(a).

40

2016 WL 1407808, at *2 ("[D]omestic violence may constitute endangerment, even if the violence is not directed at the child."); *In re A.V.M.*, No. 13-12-00684-CV, 2013 WL 1932887, at *5 (Tex. App.—Corpus Christi–Edinburg May 9, 2013, pet. denied) (mem. op.) ("It is self[-]evident that parents perpetrating violence towards certain [other] members of the family threaten the emotional developmental and well-being of any child.").

Viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could have formed a firm belief or conviction that father engaged, or knowingly placed D.J.G. with persons who engaged, in conduct that endangered D.J.G.'s physical and emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E). And, viewing the evidence in a neutral light, we conclude that a reasonable fact finder could have formed a firm belief or conviction that father engaged, or knowingly placed D.J.G. with persons who engaged, in conduct that endangered D.J.G.'s physical and emotional well-being. *See id.* Further, we conclude that the trial court could have reconciled any disputed evidence in favor of finding that father engaged, or knowingly placed D.J.G. with persons who engaged, in conduct that endangered D.J.G.'s physical and emotional well-being or any disputed evidence was not so significant that a fact finder could not have reasonably formed a firm belief or conviction that father engaged, or knowingly placed D.J.G.

41

with persons who engaged, in conduct that endangered D.J.G.'s physical and emotional well-being. *See id.*

Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding that father engaged, or knowingly placed D.J.G. with persons who engaged, in conduct that endangered D.J.G.'s physical and emotional well-being. *See id.*

We overrule father's second issue.

As previously noted, only one predicate finding under Texas Family Code section 161.001(b)(1) is necessary to support termination of father's parental rights to D.J.G. *See In re A.V.*, 113 S.W.3d at 362. Accordingly, having held that the evidence is legally and factually sufficient to support the trial court's finding, under Texas Family Code section 161.001(b)(1)(E)—that father engaged, or knowingly placed D.J.G. with persons who engaged, in conduct that endangered D.J.G.'s physical and emotional well-being—we need not address father's third issue in which he argues that the evidence is legally and factually insufficient to support the trial court's finding under Texas Family Code section 161.001(b)(1)(O) that father failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return of D.J.G. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(O); *In re A.V.*, 113 S.W.3d at 362; *Walker*, 312 S.W.3d at 618; *see also* TEX. R. APP. P. 47.1.

42

**B.     Best Interest**

In his fourth issue, father argues that the evidence is factually insufficient to support the trial court's finding that termination of his parental rights was in the best interest of D.J.G. because D.J.G. was "equally happy with both [his] foster parents and [f]ather," there was no evidence that father could not meet D.J.G.'s needs, father was not in an "ongoing relationship" with mother, father did not have a "deficit in parenting skills," father had a support system, there was no evidence that father was unable to provide a stable environment for D.J.G., and father completed "the vast majority of" the requirements of his FSP.

The best-interest analysis evaluates the best interest of the child. *See In re M.A.A.*, No. 01-20-00709-CV, 2021 WL 1134308, at \*20 (Tex. App.—Houston [1st Dist.] Mar. 25, 2021, no pet.) (mem. op.); *In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.). It is presumed that the prompt and permanent placement of the child in a safe environment is in his best interest. *See* TEX. FAM. CODE ANN. § 263.307(a); *In re D.S.*, 333 S.W.3d at 383.

There is also a strong presumption that the child's best interest is served by maintaining the parent-child relationship. *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.). Thus, we strictly scrutinize termination proceedings in favor of the parent. *See In re M.A.A.*, 2021 WL 1134308, at \*20; *In re N.L.D.*, 412 S.W.3d 810, 822 (Tex. App.—Texarkana 2013, no pet.).

In determining whether the termination of father's parental rights was in the best interest of D.J.G. we may consider several factors, including: (1) the desires of D.J.G.; (2) the current and future physical and emotional needs of D.J.G.; (3) the current and future emotional and physical danger to D.J.G.; (4) the parental abilities of the parties seeking custody; (5) whether programs are available to assist those parties; (6) plans for D.J.G. by the parties seeking custody; (7) the stability of the proposed placement; (8) the parent's acts or omissions that may indicate that the parent-child relationship is not proper; and (9) any excuse for the parent's acts or omissions. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *In re L.M.*, 104 S.W.3d at 647. We may also consider the statutory factors set forth in Texas Family Code section 263.307. *See* TEX. FAM. CODE ANN. § 263.307; *In re A.C.*, 560 S.W.3d 624, 631 n.29 (Tex. 2018); *In re C.A.G.*, No. 01-11-01094-CV, 2012 WL 2922544, at *6 & n.4 (Tex. App.—Houston [1st Dist.] June 12, 2012, no pet.) (mem. op.).

These factors are not exhaustive, and there is no requirement that DFPS prove all factors as a condition precedent to the termination of parental rights. *See In re C.H.*, 89 S.W.3d at 27; *see also In re C.L.C.*, 119 S.W.3d 382, 399 (Tex. App.—Tyler 2003, no pet.) ("[T]he best interest of the child does not require proof of any unique set of factors nor limit proof to any specific factors."). The absence of evidence about some of the factors does not preclude a fact finder from reasonably

forming a strong conviction or belief that termination is in the child's best interest. *In re C.H.*, 89 S.W.3d at 27; *In re J.G.S.*, 574 S.W.3d 101, 122 (Tex. App.—Houston [1st Dist.] 2019, pet. denied).

The same evidence of acts and omissions used to establish grounds for termination under Texas Family Code section 161.001(b)(1) may also be relevant to determining the best interest of the child. *See In re C.H.*, 89 S.W.3d at 28; *In re L.M.*, 104 S.W.3d at 647. The trial court is given wide latitude in determining the best interest of the child. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *see also Cuellar v. Flores*, 238 S.W.2d 991, 992 (Tex. App.—San Antonio 1951, no writ) (trial court "faces the parties and the witnesses, observes their demeanor and personality, and feels the forces, powers, and influences that cannot be discerned by merely reading the record").

### 1. Child's Desires

When father's parental rights were terminated, D.J.G. was about one-year old, and as such, he could not directly express a desire as to whether he wished to be placed in father's care or remain in the care of his foster parents.

When there is no specific evidence of a child's desires and a child is too young to express those desires, a fact finder may consider evidence that the child is bonded with his foster family and receives good care in his current placement. *See In re L.W.*, No. 01-18-01025-CV, 2019 WL 1523124, at *18 (Tex. App.—Houston [1st

45

Dist.] Apr. 9, 2019, pet. denied) (mem. op.); *In re L.M.N.*, 2018 WL 5831672, at *20. DFPS caseworker Jones testified that D.J.G. had been in the same two-parent foster home since he had entered DFPS's care in 2021. D.J.G.'s foster parents wanted to adopt him. D.J.G. was thriving in his placement, and his foster parents were meeting his physical and emotional needs. While in his foster parents' care, D.J.G. had received a dental examination and his "one-year-old [medical] checkup." Because of his developmental delays, he received occupational and physical therapy. D.J.G.'s foster parents were providing D.J.G. with a nurturing, protective, and safe environment.

Child Advocates representative Andrews similarly testified that D.J.G. was a happy child and his foster parents were highly supportive of him and were facilitating his developmental needs through therapy. D.J.G.'s foster parents had a loving home and other young children in the home. D.J.G.'s foster parents were meeting his needs and would be able to meet his needs in the future.

D.J.G.'s foster mother testified that she and her husband wanted to adopt D.J.G. D.J.G.'s foster parents had also adopted twins, so D.J.G. had siblings in the home. According to D.J.G.'s foster mother, D.J.G. was going to need "therapeutic services for several years to kind of catch up" developmentally and she and her husband were willing to provide that for him as long as he needed it.

D.J.G.'s foster mother also testified that D.J.G. was placed in her home on October 4, 2021 and had developmental delays and was behind "on typical milestones." He was not rolling over or crawling at one-year old, and he was "apprehensive to eating." D.J.G. was mostly formula fed. With occupational therapy and physical therapy, D.J.G. had made significant improvements. Within the last four to six weeks before trial, D.J.G.'s foster mother had seen progression with D.J.G.'s crawling and standing up around furniture. D.J.G. attended occupational therapy and physical therapy on a weekly basis. D.J.G. was also seeing an eating specialist to aid him with his food progression, and he was going to start speech therapy soon. The speech therapy was for "early intervention" and was also going to work with him on eating.

According to DFPS's September 2022 permanency report, D.J.G.'s mental, social, physical, and medical needs were being met in his foster home. D.J.G. loved his foster family, and he participated in age-appropriate activities with his foster family. He was interested in playing with toys and his foster siblings. D.J.G.'s foster parents "ensured that he [was] able to live a normal life." While in his foster parents' care, D.J.G. had received medical and dental checkups. He also received occupational, physical, and speech therapy. *See In re L.M.N.*, 2018 WL 5831672, at *20 (considering evidence children doing well in placement with foster parents, who were meeting children's needs); *In re M.L.R-U., Jr.*, 517 S.W.3d 228, 238 (Tex.

App.—Texarkana 2017, no pet.) (considering evidence foster family provided safe and healthy environment when determining children's desires).

There is also evidence that D.J.G. appeared bonded with father at visits. However, at some of his visits with D.J.G., father appeared intoxicated. He was slurring his words, stumbling, and could not keep his balance, and the visits were terminated early because of father's behavior. We note that even when a child is attached to a parent, his desire to be returned to the parent's care is not dispositive of the best-interest analysis. *See In re D.R.L.*, No. 01-15-00733-CV, 2016 WL 672664, at *5 (Tex. App.—Houston [1st Dist.] Feb. 18, 2016, no pet.) (mem. op.); *see also In re J.H.*, No. 01-22-00629-CV, 2023 WL 2169952, at *18 (Tex. App.— Houston [1st Dist.] Feb. 23, 2023, no pet. h.) (mem. op.); *In re K.S.O.B.*, No. 01-18-00860-CV, 2019 WL 1246348, at *19 (Tex. App.—Houston [1st Dist.] Mar. 19, 2019, no pet.) (mem. op.) (even though children appeared happy to see parent at visits, that is not dispositive of best-interest analysis).

## 2. Current and Future Physical and Emotional Needs and Current and Future Physical and Emotional Danger

### a. *D.J.G.'s Needs*

DFPS caseworker Jones testified that D.J.G. was born prematurely because of mother's narcotics use while pregnant.[25] At the time of birth, mother and D.J.G.

---

[25] Mother admitted to using methamphetamine and marijuana while pregnant with D.J.G., and she tested positive for heroin shortly after D.J.G.'s birth.

both tested positive for an "opioid dependence medication," and D.J.G. was diagnosed with neonatal abstinence syndrome.[26] He experienced "opiate withdrawals" after birth.

Father's FSP similarly explained that D.J.G. was born prematurely at "[seven] months gestation." And he was diagnosed with neonatal abstinence syndrome because of mother's use of "an opioid dependence medication," which caused D.J.G. "to experience withdrawal symptoms" following his birth. D.J.G. needed morphine to manage his symptoms. D.J.G. experienced difficulty with feeding, which was common for babies who had been exposed to narcotics during pregnancy.

DFPS's September 2022 permanency report states that at one-year old, D.J.G. was "nonverbal" and could not walk or crawl and he had feeding difficulties. D.J.G. was developmentally delayed, and he received occupational, physical, and speech therapy.

As to D.J.G.'s development, Jones testified that D.J.G. was "a little delayed" developmentally. He did not begin crawling until after he turned one-year old. He received occupational therapy and physical therapy to help with his development. D.J.G. had been making progress developmentally through his therapies. And Jones noted that certain therapies, including speech therapy, occupational therapy, and

---

[26]    See In re M.T., 2022 WL 3204819, at *7 (neonatal abstinence syndrome "refers to the collection of symptoms a child exhibits if the child was exposed to opiate drugs in utero").

49

physical therapy, were planned for D.J.G. in the future. According to Jones, D.J.G. was a young, vulnerable, and fragile child, who needed a nurturing, protective, and safe environment in which to live.

D.J.G.'s foster mother testified that D.J.G. had developmental delays and was behind "on typical milestones." He was not rolling over or crawling at one-year old, and he was "apprehensive to eating." D.J.G. was mostly formula fed. But with occupational therapy and physical therapy, D.J.G. had made significant improvements. Within the last four to six weeks before trial, D.J.G.'s foster mother had seen progression with D.J.G.'s crawling and standing up around furniture. D.J.G. attended occupational therapy and physical therapy on a weekly basis. D.J.G. was also seeing an eating specialist to aid him with his food progression, and he was going to start speech therapy soon. The speech therapy was for "early intervention" and was also going to work with him on eating. According to D.J.G.'s foster mother, D.J.G. was going to need "therapeutic services for several years to kind of catch up" developmentally.

It is undisputed that D.J.G.'s foster parents were meeting his physical and emotional needs and could do so in the future. They ensured that he received medical and dental checkups and participated in the necessary therapies. *See In re M.A.A.*, 2021 WL 1134308, at *23 (child's basic needs include medical and dental care); *In re A.S.*, No. 02-19-00429-CV, 2020 WL 2071944, at *7–8 (Tex. App.—

Fort Worth Apr. 30, 2020, pet. denied) (mem. op.) (considering child had benefitted while in placement with foster parents because child had been able to access necessary physical therapy on regular basis). For instance, Child Advocates representative Andrews explained that D.J.G.'s foster parents were highly supportive of him and were facilitating his developmental needs through therapy. And DFPS's September 2022 permanency report explained that D.J.G.'s mental, social, physical, and medical needs were being met in his foster home. D.J.G. loved his foster family, and he participated in age-appropriate activities with his foster family. He was interested in playing with toys and his foster siblings. D.J.G.'s foster parents "ensured that he [was] able to live a normal life." D.J.G.'s foster mother testified that she and her husband would be willing to ensure that D.J.G. received therapeutic services for as long as he needed them. *See K. N. M. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-18-00284-CV, 2018 WL 4087730, at \*8 (Tex. App.—Austin Aug. 28, 2018, pet. denied) (mem. op.) (considering evidence showed foster parents could provide for child's emotional and physical needs, along with her challenging medical needs).

In contrast, when father was asked at trial, "If [D.J.G. was] to be returned home to you, what is your plan for him?," father did not specifically express a desire to continue addressing D.J.G.'s therapeutic needs. Instead, father generally stated that he planned to "show him life that [he] showed for [his] other children." And

51

father would "take him on trips," "watch him grow," love him, and care for him. There was no evidence presented at trial that D.J.G.'s developmental delays and extensive therapeutic needs would be met if he was placed in father's care. *See In re A.S.*, No. 02-19-00422-CV, 2020 WL 990028, at *7 (Tex. App.—Fort Worth Mar. 2, 2020, no pet.) (mem. op.) (concluding there was no evidence parent could provide therapies, structure, and permanence child needed where parent generally testified his "parenting plan" was "being there for [his] child" "for the fullest" "extent possible" (internal quotations omitted)); *see also In re A.J.A.D.*, No. 01-22-00521-CV, 2022 WL 17813763, at *13 (Tex. App.—Houston [1st Dist.] Dec. 20, 2022, pet. filed) (mem. op.) ("The evidence shows that [DFPS] has seen to it that the children have a stable foster placement at present and that only [DFPS] has a meaningful plan for the children's future . . . .").

b.    *Violence and Criminal Conduct*

Violence in the home undermines the safety of the home environment and is relevant when considering the best interest of the child. *See In re L.W.*, 2019 WL 1523124, at *19; *In re A.K.*, Nos. 07-17-00353-CV, 07-17-00354-CV, 2018 WL 912703, at *5 (Tex. App.—Amarillo Feb. 15, 2018, pet. denied) (mem. op.). And evidence of a parent's past misconduct can be used to measure a parent's future conduct. *In re A.M.*, 385 S.W.3d 74, 82 (Tex. App.—Waco 2012, pet. denied); *Banargent v. Brent*, No. 14-05-00574-CV, 2006 WL 462268, at *2 (Tex. App.—

52

Houston [14th Dist.] Feb. 28, 2006, no pet.) (mem. op) (past violence can support a finding of likely future violence); *see also Schaban-Maurer v. Maurer-Schaban*, 238 S.W.3d 815, 824 (Tex. App.—Fort Worth 2007, no pet.) ("[T]rial courts [have] relied on evidence of past violence as an indicator of future behavior in parental termination and child custody cases.").

Further, a parent's criminal history is relevant in analyzing the present and future emotional and physical danger to a child and whether a parent is capable of providing a safe and stable home for his child. *See In re J.S.B.*, 2017 WL 6520437, at *18–19; *In re T.L.S.*, No. 01-12-00434-CV, 2012 WL 6213515, at *6 (Tex. App.—Houston [1st Dist.] Dec. 13, 2012, no pet.) (mem. op.) (evidence of parent's criminal history may support trial court's finding termination of parental rights in children's best interest). Notably, "[a]s a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of [the] child." *In re R.W.*, 129 S.W.3d at 739.

DFPS caseworker Jones testified that father had previously been convicted of the offense of assault of a family member,[27] stemming from an incident between mother and father in 2018. As to father's commission of the 2018

---

[27] *See* TEX. PENAL CODE ANN. § 22.01(a)(1); *see also id.* § 12.21 ("An individual adjudged guilty of a [c]lass A misdemeanor [offense] shall be punished by: (1) a fine not to exceed $4,000; (2) confinement in jail for a term not to exceed one year; or (3) both such fine and confinement.").

assault-of-a-family-member offense, Jones testified that mother was the complainant, and father had "struck her with his hand." Father was found guilty of the offense of assault of a family member and sentenced to confinement for 300 days.

The indictment related to appellant's commission of the 2018 offense of assault of a family member alleged that, on or about April 11, 2018, father "intentionally and knowingly cause[d] bodily injury to [mother], a person with whom [father] had a dating relationship, . . . by striking [mother] with his hand." *See* TEX. PENAL CODE ANN. § 22.01(a)(1); *see also id.* § 12.21 ("An individual adjudged guilty of a [c]lass A misdemeanor [offense] shall be punished by: (1) a fine not to exceed $4,000; (2) confinement in jail for a term not to exceed one year; or (3) both such fine and confinement."). On May 2, 2019, father was convicted of the misdemeanor offense of assault of a family member and was sentenced to confinement for 300 days. The trial court then suspended father's sentence, placed father on community supervision for fifteen months, and assessed a fine of $100. *See* TEX. FAM. CODE ANN. § 263.307(b)(7) (in determining whether parent able to provide child with safe environment, considering history of abusive and assaultive conduct by child's family and others with access to child's home); *In re A.K.T.*, 2018 WL 6423381, at *12, *16 (considering evidence of parent's history of engaging in violent and abusive conduct in analyzing current and future emotional danger to

54

child; parent's lack of self-control and propensity for violence may be considered as evidence of endangerment); *Clements v. Haskovec*, 251 S.W.3d 79, 87 (Tex. App.—Corpus Christi–Edinburg 2008, no pet.) (in termination-of-parental-rights cases, evidence parent engaged in abusive conduct in past permits inference parent will continue behavior in future); *see also In re K.J.G.*, No. 04-19-00102-CV, 2019 WL 3937278, at *4 (Tex. App.—San Antonio Aug. 21, 2019, pet. denied) (mem. op.) (in determining whether parental conduct endangered child's physical and emotional well-being, trial court may consider conduct that did not occur in child's presence); *In re J.B.M.*, 2019 WL 1139858, at *2 ("Domestic violence and a propensity for violence may be considered evidence of endangerment, even if the endangering acts did not occur in the children's presence, were not directed at the children, or did not cause actual injury to the children.").

Jones also testified that at the time of trial father was charged with the offense of aggravated assault of a family member,[28] stemming from an incident between mother and father in 2021, while mother was pregnant with D.J.G. Jones stated that the offense occurred on April 3, 2021, and mother was the complainant. Father knew mother was five-months pregnant with D.J.G. at the time, but he hit mother's car in

---

[28] *See id.* §§ 22.01(a)(2), 22.02(a)(2), (b)(1); *see also* TEX. FAM. CODE ANN. § 71.0021(b); TEX. PENAL CODE ANN. § 12.32 ("An individual adjudged guilty of a felony of the first degree shall be punished by imprisonment in the Texas Department of Criminal Justice for life or for any term of not more than 99 years or less than 5 years [and] . . . a fine not to exceed $10,000.").

"a head-on collision" with his car, and then pulled a man, who was in mother's car, out of her car and "assaulted him." Father hit mother's car "so hard" with his car "that there was actual front-end damage to both" cars. Jones noted that such behavior by father constituted "endangering conduct" because father "knew that [mother] was pregnant and he used a [car] as a weapon to harm not only her but also [D.J.G.,] his unborn child." *See In re E.T.*, No. 02-22-00299-CV, 2022 WL 17172492, at *7 (Tex. App.—Fort Worth Nov. 23, 2022, no pet.) (mem. op.) (parent's domestic abuse of mother, including while mother was pregnant with child, endangered child's physical safety and parent's pattern of abusive behavior created presumption that similar conduct could recur); *In re S.L.W.*, 529 S.W.3d 601, 613–14 (Tex. App.—Texarkana 2017, pet. denied) (trial court, as fact finder, could have reasonably inferred parent presented danger to child's well-being where parent assaulted mother while pregnant with child and while mother was pregnant with child's sibling). According to Jones, if father was convicted of the offense of aggravated assault of a family member, father would "face a significant [amount of] time in jail." And if father went to jail, "where [was D.J.G.] going to go?"

The indictment related to the 2021 felony offense of aggravated assault of a family member with which appellant was charged alleged that, on or about April 3, 2021, father "unlawfully, intentionally[,] and knowingly threaten[ed] [mother], . . . a person with whom [father] had a dating relationship, with imminent bodily injury by

56

using and exhibiting a deadly weapon, namely a motor vehicle." *See* TEX. PENAL CODE ANN. §§ 22.01(a)(2), 22.02(a)(2), (b)(1); *see also* TEX. FAM. CODE ANN. §§ 71.0021(b), 263.307(b)(7); *In re K.J.G.*, 2019 WL 3937278, at \*4; *In re J.B.M.*, 2019 WL 1139858, at \*2; *In re A.K.T.*, 2018 WL 6423381, at \*12, \*16; *Clements*, 251 S.W.3d at 87. If father is convicted of the felony offense of aggravated assault of a family member, his punishment may be assessed at "imprisonment in the Texas Department of Criminal Justice for life or for any term of not more than 99 years or less than 5 years [and] . . . a fine not to exceed $10,000." TEX. PENAL CODE ANN. § 12.32; *see also E. B. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-18-00427-CV, 2018 WL 6056959, at \*3 (Tex. App.—Austin Nov. 20, 2018, pet. denied) (mem. op.) ("A parent's current and future incarceration is relevant to his ability to meet the child's present and future physical and emotional needs . . . ."); *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.) ("[W]hen a parent is incarcerated, he or she is absent from the child's daily life and unable to provide support to the child, negatively impacting the child's living environment and emotional well-being.").

Criminal activity that exposes a parent to the potential for incarceration is relevant to the trial court's best-interest determination. *See In re M.A.A.*, 2021 WL 1134308, at \*26; *see also C.M.M. v. Dep't of Fam. & Protective Servs.*, Nos. 14-21-00702-CV, 14-21-00730-CV, 2022 WL 1789925, at \*16 (Tex. App.—

Houston [14th Dist.] June 2, 2022, pet. denied) (mem. op.) (criminal activity contributes to instability in home). And here father has a pending charge against him which involves assaulting mother while father knew that she was pregnant with D.J.G. *See In re S.H.*, No. 01-22-00255-CV, 2022 WL 17254956, at *17–18 (Tex. App.—Houston [1st Dist.] Nov. 29, 2022, pet. denied) (mem. op.) (holding evidence sufficient to support trial court's best-interest finding where parent had pending criminal case against him which involved assaulting mother of parent's other child); *In re E.T.*, 2022 WL 17172492, at *7 (parent's domestic abuse of mother, including while mother was pregnant with child, endangered child's physical safety).

Further, we note that related to father's charge for the felony offense of aggravated assault of a family member, father was subject to bond conditions, which required father, among other things, to have no contact with mother and to refrain from using, possessing, or consuming alcohol, controlled substances, "dangerous drug[s]," or marijuana unless prescribed by a medical doctor. Yet, father tested positive for narcotics use multiple times during the pendency of this case and father admittedly had contact with mother in violation of his bond conditions. Jones testified that father had violated his bond conditions during the pendency of this case, and according to Jones, father's failure to comply with his bond conditions was concerning because if his "bond [was] revoked," "he would go back to jail." *See In re E.T.*, 2022 WL 17172492, at *7 (parent's bond violations demonstrated pattern of

58

lawbreaking that created instability and looming threat of incarceration); *In re A.O.*, No. 02-21-00376-CV, 2022 WL 1257384, at *15–16 (Tex. App.—Fort Worth Apr. 28, 2022, pet. denied) (mem. op.) (evidence supported trial court's best-interest finding where parent "violated the [Texas] Penal Code," "violated her community supervision," and "violated the conditions of her bond"); *see also In re T.D.*, No. 02-22-00215-CV, 2022 WL 11483054, at *10 (Tex. App.—Fort Worth Oct. 20, 2022, pet. denied) (mem. op.) (in analyzing emotional and physical danger to child, considering parent had violated bond conditions).

Finally, Jones testified that mother and father had been in a dating relationship, at least since 2018.[29] And father and mother's relationship was "extremely violent." When father found out that mother was pregnant with D.J.G., he assaulted her. *See In re E.T.*, 2022 WL 17172492, at *7 (parent's domestic abuse of mother, including while mother was pregnant with child, endangered child's physical safety and parent's pattern of abusive behavior created presumption that similar conduct could recur); *In re S.L.W.*, 529 S.W.3d at 613–14 (trial court, as fact finder, could have reasonably inferred parent presented danger to child's well-being where parent assaulted mother while pregnant with child and while mother was

---

[29] Father testified that at the time of trial he had no contact with mother, but he also admitted to having contact with mother during the pendency of the case, explaining that he asked her for a ride to one of his visits with D.J.G. because his car was not working and she "was there."

pregnant with child's sibling). Father's FSP also noted that mother had reported to DFPS that father had previously "beat her up."

Further, D.J.G.'s foster mother testified that D.J.G.'s older brother told her that, while living with mother, he had witnessed domestic violence between mother and father. *See In re H.L.F.*, No. 12-11-00243-CV, 2012 WL 5993726, at *7 (Tex. App.—Tyler Nov. 30, 2012, pet. denied) (mem. op.) (conduct toward other children relevant consideration); *Jordan*, 325 S.W.3d at 724. He told D.J.G.'s foster mother that mother and father's relationship had been "very physical" and it contained "a lot of violence," "a lot of drug use," and "a lot of sexual activity in front of" the older brother and his siblings. The older brother often saw mother "get beat down and busted up" by father and "it was just almost nonstop." Mother and father's relationship had traumatized the older brother, and the older brother displayed similar violent behaviors while in D.J.G.'s foster mother's home, which the foster mother believed had been learned while in the care of mother. *See* TEX. FAM. CODE ANN. § 263.307(b)(7) (in determining whether parent able to provide child with safe environment, considering history of abusive and assaultive conduct by child's family and others with access to child's home); *In re N.J.H.*, 575 S.W.3d at 835 (history of domestic violence supports trial court's finding that termination of parental rights in child's best interest); *In re J.S.–A*, No. 01-17-00491-CV, 2018 WL 891236, at *8 (Tex. App.—Houston [1st Dist.] Feb. 15, 2018, pet. denied) (mem. op.) (evidence

60

of violence in home supports finding placement of children with parent likely to subject them to emotional and physical danger now and in future); *see also In re O.L.S.*, No. 04-22-00041-CV, 2022 WL 2334551, at *5 (Tex. App.—San Antonio June 29, 2022, no pet.) (mem. op.) (evidence of violence in parent's relationships, even when child not in parent's care, supported trial court's finding that termination of parental rights in child's best interest); *In re A.E., Jr.*, No. 04-14-00092-CV, 2014 WL 3013210, at *4 (Tex. App.—San Antonio July 2, 2014, no pet.) (mem. op.) (in holding evidence sufficient to support trial court's best-interest finding, noting parent had engaged in domestic or family violence in separate relationship with person that was not child's parent).

Notably, a child's need for a safe and stable home is the paramount consideration in assessing the best interest of the child. *See* TEX. FAM. CODE ANN. § 263.307(a) (prompt and permanent placement of child in safe environment presumed to be in child's best interest); *In re G.M.G.*, 444 S.W.3d 46, 60 (Tex. App.—Houston [14 Dist.] 2014, no pet.) (parent who lacks ability to provide child with safe and stable home is unable to provide for child's emotional and physical needs). But domestic violence, want of self-control, and a propensity for violence constitute evidence of endangerment. *In re J.I.T.P.*, 99 S.W.3d at 845; *see also In re J.B.M.*, 2019 WL 1139858, at *2 ("Domestic violence and a propensity for violence may be considered evidence of endangerment, even if the endangering acts

61

did not occur in the children's presence, were not directed at the children, or did not cause actual injury to the children.") *In re A.V.M.*, 2013 WL 1932887, at \*5 ("It is self[-]evident that parents perpetrating violence towards certain [other] members of the family threaten the emotional developmental and well-being of any child."); *Schaban-Maurer*, 238 S.W.3d at 824 ("[T]rial courts [have] relied on evidence of past violence as an indicator of future behavior in parental termination and child custody cases."). Here, Jones testified, and father admitted, that father had not completed the domestic violence treatment program that was required by his FSP.

### c. *Narcotics Use*

Illegal narcotics use by a parent may constitute evidence of current and future danger to a child. *See In re O.J.P.*, No. 01-21-00163-CV, 2021 WL 4269175, at \*19–21 (Tex. App.—Houston [1st Dist.] Sept. 21, 2021, no pet.) (mem. op.) (considering evidence of parent's narcotics use in determining current and future danger to child); *see also In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) (stating "a parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct"); *In re S.R.H.*, No. 01-15-0714-CV, 2016 WL 430462, at \*10–11 (Tex. App.—Houston [1st Dist.] Feb. 4, 2016, no pet.) (mem. op.) (parent's past narcotics use is indicative of instability in home environment); *Cervantes-Peterson*, 221 S.W.3d at 254–55 (illegal narcotics use while parental

rights are in jeopardy may be considered endangering course of conduct critical to finding that termination is in child's best interest).

Father testified that he began using opiates in 2020 and he had previously used oxycodone. According to father, he "went into rehab" in the spring of 2022 "to get help to get [himself] away from painkillers." He was at a detox center for thirty days and was discharged on April 2, 2022. Father did not have a sponsor but was participating in a "higher power program."

Jones testified that father had a substantial history of narcotics use. Jones stated that on October 14, 2021, father tested positive for benzodiazepines. In November 2021, father tested negative for narcotics use. But on December 20, 2021, father tested positive for oxymorphone and oxycodone. On February 28, 2022, father tested positive for cocaine, oxymorphone, and oxycodone. In May 2022, father tested positive for oxycodone. Father tested negative for narcotics use in July and August 2022. According to Jones, father's narcotics-use testing during the pendency of the case showed an increase in narcotics-use over time. And father's pattern of narcotics use during the pendency of this case constituted endangering conduct. Although father's most recent narcotics-use test was negative that was not enough to show sobriety. Further, Jones noted that father's narcotics use during the pendency of the case violated his bond conditions related to the 2021

aggravated-assault-of-a-family-member offense with which he was charged and subjected him to the possibility of "go[ing] back to jail."

Copies of father's narcotics-use testing results show that on October 14, 2021, father tested positive for benzodiazepines by urinalysis.[30]  On November 30, 2021, father tested negative for narcotics use.  On December 20, 2021, father tested positive for oxycodone and oxymorphone by urinalysis and positive for oxycodone by hair-follicle testing.  On February 17, 2022, father failed to appear for narcotics-use testing as ordered by the trial court.  *See In re C.A.B.*, 289 S.W.3d at 885 (fact finder could infer that parent's failure to submit to court-ordered narcotics-use testing indicated that she was avoiding testing because she was using narcotics); *see also In re T.L.S.*, 2012 WL 6213515, at *6 (considering evidence of parent's refusal to take court-ordered narcotics-use test in determining best interest of child).  On February 28, 2022, father tested positive for benzodiazepines, oxycodone, and oxymorphone by urinalysis and cocaine, oxycodone, and oxymorphone by hair-follicle testing.  On May 11, 2022, father tested negative for narcotics use by urinalysis, but positive for oxycodone by hair-follicle testing.  On May 31, 2022, father tested negative for narcotics use by urinalysis, but positive for oxycodone by hair-follicle testing.  *See In re J.O.A.*, 283 S.W.3d at 345 (parent's use

---

[30]    DFPS's September 2022 permanency report also states that father tested positive for marijuana by hair-follicle testing on September 28, 2021.

of narcotics and its effect on her ability to parent qualifies as endangering conduct); *In re M.R.R.*, No. 10-15-00303-CV, 2016 WL 192583, at *5 (Tex. App.—Waco Jan. 14, 2016, no pet.) (mem. op.) ("A parent's continued drug use demonstrates an inability to provide for the child's emotional and physical needs and to provide a stable environment for the child."); *In re A.A.M.*, 464 S.W.3d at 426 ("Illegal drug use creates the possibility that the parent will be impaired or imprisoned and thus incapable of parenting."); *see also In re D.M.*, 452 S.W.3d 462, 471–72 (Tex. App.—San Antonio 2014, no pet.) (fact finder can infer future endangering conduct based on parent's past conduct when assessing child's best interest).

D.J.G.'s foster mother also testified that D.J.G.'s older brother reported to her that father and mother's relationship had consisted of "a lot of drug use" and D.J.G.'s older brother often saw mother "pretty much comatose[] on opioids." *See In re S.R.H.*, 2016 WL 430462, at *10–11 (parent's past narcotics use is indicative of instability in home environment); *In re Z.C.*, 280 S.W.3d 470, 477–78 (Tex. App.—Fort Worth 2009, pet. denied) (considering parent exposed other children to illegal narcotics use in analyzing best interest); *see also In re H.L.F.*, 2012 WL 5993726, at *7 (conduct toward other children relevant consideration); *Jordan*, 325 S.W.3d at 724.

We note that DFPS's September 2022 Permanency Report notes that father tested negative for narcotics use by urinalysis on June 15, 2022, July 14, 2022, July

28, 2022, August 9, 2022, and August 25, 2022. But evidence "of a recent turn-around with respect to substance abuse does not . . . necessarily make a trial court's best interest finding . . . insufficient." *In re S.V.H.*, No. 01-19-01003-CV, 2020 WL 2988567, at *9 (Tex. App.—Houston [1st Dist.] June 4, 2020, pet. denied) (mem. op.). And evidence of a recent improvement does not absolve a parent of a history of narcotics use and irresponsible choices. *See In re J.H.G.*, No. 01-16-01006-CV, 2017 WL 2378141, at *9 (Tex. App.—Houston [1st Dist.] June 1, 2017, pet. denied) (mem. op.) ("A factfinder . . . is not required to ignore a history of narcotics use merely because it abates as trial approaches."); *In re O.R.F.*, 417 S.W.3d 24, 40 (Tex. App.—Texarkana 2013, pet. denied); *see also Cervantes-Peterson*, 221 S.W.3d at 254 (concluding despite parent's assertion that she had stopped using cocaine and marijuana, trial court was not required to ignore her history of narcotics use merely because she testified that it had abated before trial). Further, father repeatedly tested positive for narcotics use during the pendency of the case when he knew that his parental rights were in jeopardy. *See In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied) (stability and permanence are of paramount importance in termination case, and parent's decision to use narcotics during pendency of termination proceeding, when parent is at risk of losing child, supports finding that parent engaged in conduct that endangered child's well-being); *see also In re I.L.*, No. 02-18-00206-CV, 2018 WL

66

5668813, at *6 (Tex. App.—Fort Worth Nov. 1, 2018, no pet.) (mem. op.) (fact finder could have based its best-interest finding on parents' narcotics use before and during pendency of case and could have found that such acts reflected poorly on parents' parental abilities and forecasted their inability to meet child's needs).

Additionally, Jones testified that father had not completed all of the requirements of his FSP related to his substance abuse issues. Father had completed six or seven individual "substance abuse therapy" classes from June 2022 to July 2022, but Jones stated that father needed more treatment because of his substantial history of narcotics use. Father also had not participated in "group therapy for substance abuse" which was required. Child Advocates representative Andrews also explained that based on father's history of narcotics use Child Advocates wanted father to engage in an intensive sobriety program, such as a "relapse prevention program" that included "a sponsor." And she explained that a longer period of negative narcotics-use testing by father was necessary to show that father could provide a safe and stable environment for D.J.G.

### 3. Parental Abilities, Plans for Child, Stability of Proposed Placement, and Availability of Assistance[31]

#### a. *Father*

DFPS caseworker Jones testified that D.J.G., who was young and vulnerable, and needed a nurturing, protective, and safe environment in which to live. *See In re A.J.B.*, No. 10-18-00274-CV, 2018 WL 6684808, at *3 (Tex. App.—Waco Dec. 19, 2018, no pet.) (mem. op.) ("[Y]oung children are particularly vulnerable if left in the custody of a parent who is unable or unwilling to protect them or attend to their needs because they have no ability to protect themselves."). And, according to Jones, for father to establish that he could provide a safe and stable environment for D.J.G., he would need to show that his home was a narcotics-free environment, he was remaining narcotics-free, he was not engaging in criminal activity, he was continuing to seek treatment for his narcotics use, and he had a consistent income. But at the time of trial, father had not been able to establish those things.

As to father's income, Jones noted that father had not provided any "paycheck stubs" related to the limousine company where he purportedly worked. And although father had told DFPS that he did "car repairs as kind of a side job," he had not provided any verifiable invoices or bank statements to "prove that income [was]

---

[31] Much of the evidence discussed above is also relevant to father's parental abilities, father's plans for D.J.G., and the stability of the proposed placements for D.J.G. *See* TEX. R. APP. P. 47.1.

consistently coming in." Another DFPS caseworker had previously explained to father that she would not be able to verify his income based on the invoices that he had provided. Essentially, father had not shown a stable income during the pendency of the case.

As to father's housing, Jones testified that father had not provided an actual lease agreement for the place where he was living; there was no contact information for his landlord on the document that father provided to DFPS.[32] The document that father provided to DFPS was not sufficient to establish stable housing.

Child Advocates representative Andrews testified that father gave Child Advocates information about his housing only seven days before trial, which made it hard to visit his home.[33]

Father testified that he lived in a "unit" that he was leasing from an individual person. He provided the DFPS caseworker with "a lease." Father worked for a limousine company, and the last time he had given the DFPS caseworker a paycheck

---

[32] Jones explained, as to the document that father had given to DFPS: "[I]t's not like your average lease where you either have a landlord or . . . you have an apartment complex and it's through management that has the address, the name, the length of stay, all the different addendums and whoever is renting it out to you, their contact information. . . . [T]hat's what it was lacking."

[33] DFPS's September 2022 permanency report similarly states that although father had reported to DFPS that he had housing, he gave DFPS a new address on September 5, 2022 and he had not provided a lease agreement. Father had also reported to DFPS that he was employed, but he had not provided proof of employment to the DFPS caseworker.

stub was in July 2022—a couple months before trial. According to father, his work with the limousine company was slow, so he had a side business "picking up customers and customers calling [him] to do work on their vehicles." He had provided the DFPS caseworker with "invoices" related to his side business. He did not have a bank account so he could not provide bank statements to show his income. Father testified that his income was about $3,500 or $4,000 a month. He paid $800 a month for rent. In total, the amount of his bills each month was less than $2,000.

Father stated that his adult children would be his support system as well as his mother and his two sisters if D.J.G. was placed in his care, but he did not explain how they would help care for D.J.G. or state that any of those individuals would care for D.J.G. should father be convicted of the felony offense of aggravated assault of a family member and imprisoned. *See In re I.L.G.*, 531 S.W.3d 346, 356 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (stability of proposed placement important consideration in determining whether termination of parental rights in children's best interest); *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("The goal of establishing a stable, permanent home for a child is a compelling . . . interest.").

Further, although it appears that father consistently visited D.J.G. throughout the case and he and D.J.G. appeared bonded at visits, father also appeared intoxicated at some visits. He was slurring his words, stumbling, and could not keep his balance.

70

These visits were terminated early because of father's behavior. Jones also testified that father brought mother, who waited in the car, to one of his visits with D.J.G., even though mother's visits with D.J.G. had been suspended by the trial court. *See In re R.W.*, 627 S.W.3d 501, 516–17 (Tex. App.—Texarkana 2021, no pet.) (parent's poor judgment may be considered when looking at child's best interest); *In re N.J.H.*, 575 S.W.3d at 835 (parent's "exercise of poor judgment currently and in the past demonstrates an inability to provide adequate care" for child (internal quotations omitted)); *Wischer v. Tex. Dep't of Family and Protective Servs.*, No. 03-12-00165-CV, 2012 WL 3793151, at *10 (Tex. App.—Austin Aug. 29, 2012, no pet.) (mem. op.) (holding fact finder could have concluded parent "lack[ed] the ability to provide adequate care by showing poor judgment currently and in the past"). According to Jones, it would be detrimental for mother to have access to D.J.G. because of her significant history of narcotics-use[34] and her complete failure to participate in the pending case.

b. *Current Placement*

DFPS caseworker Jones testified that D.J.G. had been in the same two-parent foster home since he had entered DFPS's care in 2021. D.J.G.'s foster parents wanted to adopt D.J.G. D.J.G.'s foster parents were aware that D.J.G. had biological

---

[34] Jones explained that mother had admitted to using methamphetamine and marijuana while pregnant with D.J.G. And mother tested positive for heroin use after D.J.G.'s birth. Mother's narcotics use contributed to D.J.G.'s premature birth.

siblings, and they were willing to ensure that he remained in contact with those siblings as much as possible. Jones also testified that D.J.G. was thriving in his placement with his foster parents, and his foster parents were meeting his physical and emotional needs. While in his foster parents' care, D.J.G. had received a dental examination and his "one-year-old [medical] checkup." According to Jones, D.J.G. was a young, vulnerable, and fragile child, who needed a nurturing, protective, and safe environment in which to live. D.J.G.'s foster parents had been providing such an environment for him and would continue to do so. *See In re J.M.*, 156 S.W.3d 696, 708 (Tex. App.—Dallas 2005, no pet.) (holding evidence sufficient to support trial court's best-interest finding termination of parental rights in child's best interest where "[t]he evidence show[ed] the foster parents' home [was] stable").

Child Advocates representative Andrews testified that D.J.G. was a happy child and D.J.G.'s foster parents were highly supportive of him and were facilitating his developmental needs through therapy. D.J.G.'s foster parents had a loving home and other young children in the home. They were meeting D.J.G.'s needs and would be able to meet his needs in the future.

D.J.G.'s foster mother testified that D.J.G. was placed in her home on October 4, 2021. Although D.J.G. had developmental delays and was behind "on typical milestones," with occupational therapy and physical therapy, D.J.G. had made significant improvements. Within the last four to six weeks before trial, D.J.G.'s

72

foster mother had seen progression with D.J.G.'s crawling and standing up around furniture. D.J.G.'s foster mother explained the different therapies that D.J.G. was participating in while in her care and testified to his therapeutic needs in the future. According to D.J.G.'s foster mother, D.J.G. was going to need "therapeutic services for several years to kind of catch up" developmentally and she and her husband were willing to provide that for him as long as he needed it. *See J.D.S. v. Tex. Dep't of Fam. & Protective Servs.*, 458 S.W.3d 33, 44–45 (Tex. App.—El Paso 2014, no pet.) (noting, in holding evidence was sufficient to support trial court's finding termination of parental rights in child's best interest, that child was thriving in placement and child was improving while in placement); *see also In re P.G.D.*, No. 04-19-00896-CV, 2020 WL 2543310, at *5 (Tex. App.—San Antonio May 20, 2020, pet. denied) (mem. op.) (considering children were in loving foster home that was meeting their needs and children were making developmental progress).

D.J.G.'s foster mother further testified that she and her husband wanted to adopt D.J.G. *See In re T.M.R.*, No. 13-21-00144-CV, 2021 WL 4998438, at *7 (Tex. App.—Corpus Christi–Edinburg Oct. 28, 2021, no pet.) (mem. op.) ("A factfinder may consider the consequences of [the] failure to terminate parental rights and may also consider that the child's best interest may be served by termination so that adoption may occur."); *In re L.W.*, 2019 WL 1523124, at *23 (in holding evidence sufficient to support trial court's best-interest finding, considering children were

73

placed in adoptive home with foster parents who wanted children to continue living with them); *see also In re J.D.*, 436 S.W.3d at 118 ("The goal of establishing a stable, permanent home for a child is a compelling . . . interest.").

D.J.G.'s foster parents had also adopted twins, so D.J.G. had siblings in the home. D.J.G.'s foster mother noted that she had facilitated "FaceTime visits" with one of D.J.G.'s biological sisters, and D.J.G. had "in-person visits with all of [his biological] siblings." D.J.G.'s foster parents were open and supportive of D.J.G. having contact with his biological siblings.

DFPS's September 2022 permanency report notes that D.J.G.'s mental, social, physical, and medical needs were being met in his foster home. D.J.G. loved his foster family, and he participated in age-appropriate activities with his foster family. He was interested in playing with toys and his foster siblings. D.J.G.'s foster parents "ensured that he [was] able to live a normal life." While in his foster parents' care, D.J.G. received medical and dental checkups. *See In re A.A.*, No. 02-17-00307-CV, 2018 WL 771972, at *6 (Tex. App.—Fort Worth Feb. 8, 2018, no pet.) (mem. op.) (considering evidence foster parents took child to all her appointments and were meeting her medical needs); *see also In re S.H.*, 2022 WL 17254956, at *14 ("[A] child's bond with his placement family implies that the child's desires would be fulfilled by adoption by the placement family."); *In re G.J.A.*, No. 13-22-00209-CV, 2022 WL 3092177, at *8 (Tex. App.—Corpus Christi–Edinburg Aug. 4, 2022, no

pet.) (mem. op.) (in holding sufficient evidence to support trial court's finding termination of parental rights in children's best interest, considering evidence showed that children were thriving in current placement, placement was meeting all of the children's needs, and children were bonded with foster family).

Viewing the evidence in a neutral light, we conclude that a reasonable fact finder could have formed a firm belief or conviction that termination of father's parental rights was in the best interest of D.J.G. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). We further conclude that the trial court could have reconciled any disputed evidence in favor of finding that termination of father's parental rights was in D.J.G.'s best interest or any disputed evidence was not so significant that a fact finder could not have reasonably formed a firm belief or conviction that termination is in the best interest of D.J.G. *See id.*

Accordingly, we hold that the evidence is factually sufficient to support the trial court's finding that termination of father's parental rights was in the best interest of D.J.G. *See id.*

We overrule father's fourth issue.

### Possessory Conservatorship

In his fifth issue, father argues that the trial court erred in not appointing father as D.J.G.'s possessory conservator because allowing father "access to [D.J.G.] would not endanger the child."

Conservatorship determinations are reviewed for an abuse of discretion and will be reversed only if the decision is arbitrary and unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *In re J.D.G.*, 570 S.W.3d 839, 856 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). An order terminating the parent-child relationship divests a parent of legal rights and duties with respect to his child. *See* TEX. FAM. CODE ANN. § 161.206(b); *see also In re A.L.J.*, No. 01-19-00251-CV, 2019 WL 4615826, at *9 (Tex. App.—Houston [1st Dist.] Sept. 24, 2019, no pet.) (mem. op.).

Here, father asserts that the trial court erred in not appointing him as a possessory conservator for D.J.G. under Texas Family Code section 153.191.

When a parent is not appointed as a sole or joint managing conservator of a child, Texas Family Code section 153.191 requires the trial court to appoint the parent as a possessory conservator of the child, "unless it finds that the appointment is not in the best interest of the child and that parental possession or access would endanger the physical or emotional welfare of the child." TEX. FAM. CODE ANN. § 153.191; *see also In re E.S.T.*, No. 01-22-00404-CV, 2022 WL 17096713, at *20 (Tex. App.—Houston [1st Dist.] Nov. 21, 2022, no pet.) (mem. op.). But, section 153.191 only applies to a "[p]arent," and father's parental rights to D.J.G. were terminated by the trial court. *See In re E.S.T.*, 2022 WL 17096713, at *20; *see also* TEX. FAM. CODE ANN. § 101.024(a) (stating "parent," as used in Texas Family Code,

76

"does not include a parent as to whom the parent-child relationship has been terminated" (internal quotations omitted)); *Z.A.R. v. Tex. Dep't of Fam. & Protective Servs.*, No. 14-20-00511-CV, 2020 WL 7866800, at *15 (Tex. App.—Houston [14th Dist.] Dec. 31, 2020, pet. denied) (mem. op.); *In re H.M.P.*, No. 13-08-00643-CV, 2010 WL 40124, at *17 (Tex. App.—Corpus Christi–Edinburg Jan. 7, 2010, no pet.) (mem. op.). Further, we have overruled father's complaint that the trial court erred in terminating his parental rights to D.J.G. Thus, the trial court's order terminating father's parental rights divested father of his legal rights and duties to D.J.G., and he is not considered a "parent" under the Texas Family Code. *See* TEX. FAM. CODE ANN. § 161.206(b); *In re A.L.J.*, 2019 WL 4615826, at *9 ("Because we have overruled [parent's] challenge to the portion of the trial court's order terminating her parental rights, the order has divested [her] of her legal rights and duties related to [the children]."); *see also* TEX. FAM. CODE ANN. § 101.024(a) (stating "[p]arent," as used in Texas Family Code, "does not include a parent as to whom the parent-child relationship has been terminated" (internal quotations omitted)). And, as such, we cannot conclude that the trial court would have abused its discretion in not appointing father, whose parental rights had been terminated, as D.J.G.'s possessory conservator under Texas Family Code section 153.191. *See In re E.S.T.*, 2022 WL 17096713, at *19–20 (overruling parent's complaint trial court erred in not appointing her as child's possessory conservator under section 153.191 because her

parental rights to child had been terminated); *In re H.M.P.*, 2010 WL 40124, at \*17 (holding trial court did not err in not appointing parent as possessory conservator under section 153.191 where parent's parental rights were terminated and appellate court had determined evidence was sufficient to support trial court's termination of parental rights); *see also In re K.P.M.*, Nos. 01-17-00327-CV to 01-17-00329-CV, 2017 WL 5353244, at \*9 (Tex. App.—Houston [1st Dist.] Nov. 10, 2017, pet. denied) (mem. op.) (where parent asserted trial court erred in failing to appoint her as possessory conservator, explaining because appellate court had "concluded that legally and factually sufficient evidence support[ed] terminating [parent's] parental rights," parent was "disqualifie[d]" from being "a conservator of her children").

Accordingly, we hold that the trial court did not err in not appointing father as D.J.G.'s possessory conservator.

We overrule father's fifth issue.

### Conclusion

We affirm the order of the trial court.


Julie Countiss
Justice

Panel consists of Justices Landau, Countiss, and Guerra.

78